UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
JAMES SHEA,

                  Plaintiff,     :    09 Civ. 8709 (THK)
                               :

     -against-                :    **MEMORANDUM OPINION**
                               :    **AND ORDER**

ROYAL ENTERPRISES, INC.,      :
and 9TH STREET VENTURES, LTD.,  :

                Defendants.  :

                               :
------------------------------------------X

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

This is an action seeking damages for the bodily injuries sustained by Plaintiff James Shea on February 28, 2009 at Solas, a bar located at 232 East 9th Street in Manhattan. Solas is operated by Defendant 9th Street Ventures, Inc. ("9th Street Ventures"), which leased the premises from Royal Enterprises, Inc. ("Royal"), defendant-owner of the property. Pursuant to 28 U.S.C. 636(c), the parties have consented to proceed before this Court for all purposes, including trial.

Before the Court is Plaintiff's motion _in limine_ seeking to preclude the proposed testimony of Defendants' forensic toxicology expert, Robert Pandina, on the grounds that Mr. Pandina did not use scientifically valid methods when he estimated Mr. Shea's blood alcohol concentration ("BAC"). Plaintiff also requests that the Court require Defendants to pay Dr. Pandina's fees and Plaintiff's costs associated with Dr. Pandina's deposition, including the

present motion.   Each Defendant opposes Plaintiff's motion and has filed a cross-motion seeking to preclude Plaintiff from submitting affidavits or testimony from his two expert witnesses, Drs. William J. Closson and Richard Saferstein.   Finally, Plaintiff claims that references to "ETOH" (medical short-hand for "ethanol") and "intoxication" are more prejudicial than probative, and, therefore, should be redacted from Plaintiff's medical records.

For reasons stated below, Plaintiff's motion is denied in its entirety, and Defendants' cross-motions are granted.[1]

I. Background

On February 28, 2009, Plaintiff visited multiple venues, consuming several alcoholic beverages throughout the day and into the night, beginning at approximately 3:30 p.m. and ending shortly before midnight. (See Deposition of James Shea, attached as Ex. C to Affirmation of R. Kaminski ("Pl.'s Affirmation"), at 56-72.)   By Plaintiff's own account, he consumed the equivalent of 12 drinks, while also consuming a considerable amount of food.   From 3:30 p.m. to 6:30 p.m., Plaintiff had two 12-ounce beers and several appetizer dishes at a friend's birthday party (see id. at 56-60); from 6:30 p.m. to 8:30 p.m., accompanied by his wife, he had two

---

[1] Each party requested a Daubert hearing in the event that it lost the present motion.   The Court, however, does not find such a hearing to be necessary.

2

16-ounce beers and unspecified amounts of bread and calamari at the Hudson Bar (see id. at 61-64); and between 8:30 p.m. and 11:00 p.m., still accompanied by his wife, Plaintiff visited the Central Bar, where he had four 16-ounce beers and one shot of whiskey while eating a cheeseburger, french fries, and chicken wings. (See id. at 64-72.)  With his dinner, he also had a pint of water. (See id.) At approximately 11:00 p.m., Plaintiff's wife went home, and Plaintiff went to meet his sister-in-law, Alison O'Brien, and her roommate, Lauren Bernden, at Solas, where he had a 12-ounce beer. (See id. at 83.)

Plaintiff's accident occurred at Solas when he attempted to go to the restroom.  He mistakenly went down a set of stairs that led to the coat check room rather than the restroom.  He contends that the stairs were poorly lit and that the tread widths were narrower than required by the New York City Building Code.  As a result, he lost his footing on the second or third step from the top of the stairway, hit his head on an overhang, and tumbled down the remainder of the steps.  Plaintiff sustained multiple skull fractures, a subarachnoid hemorrhage, damage to brain tissue, and traumatic brain injury. See Shea v. Royal Enterprises, Inc., No. 09 Civ. 8709 (THK), 2011 WL 43460, at *1 (S.D.N.Y. Jan. 6, 2011). Alison O'Brien accompanied Mr. Shea to St. Vincent's Hospital. (See Deposition of Alison O'Brien, attached as Ex. D to Pl.'s

3

Affirmation, at 43.)   Mr. Shea's wife and Ms. Bernden went separately to the hospital. (See id.)

Dr. Pandina was retained by Defendant 9th Street Ventures to "render an opinion as to the effect of alcohol consumption" by Mr. Shea on the night in question. (See 9th Street Venture Exchange of Expert Witness Information ("Pandina Report"), attached as Ex. A to Pl.'s Affirmation.)   Based on documents produced in this case and employing a "modified Widmark formula,"[2] Dr. Pandina performed a retrograde extrapolation and approximated that Mr. Shea's BAC was between .14% and .16% at the time of the accident.

Dr.   Pandina   characterized   this   BAC   range   as   "acute

---

[2] The Widmark formula, as used by Dr. Pandina, finds a subject's BAC at a given point in time by multiplying the liquid ounces of alcohol consumed ("A") by a conversion factor of 5.14, which converts A from ounce terms to pound terms.   The product of these two variables is divided by the product of the subject's body weight ("W") times the subject's reduced body mass ("r"), which represents that portion of a person's body that can absorb alcohol (roughly translated, it is a way to account for the fact that bones and fat do not absorb alcohol).   To account for the passage of time, Dr. Pandina took this quotient and subtracted from it the product of the time that passed in hours ("T") and the burn-off rate of alcohol per hour("$\beta$").
Expressed mathematically, the equation is as follows:

$$BAC = [(5.14*A)/(W*r)] - (T*\beta)$$

where,
5.14 = the conversion rate; A = liquid ounces of alcohol consumed; W = body weight (in pounds); r = reduced body mass; T = time (in hours); and $\beta$ = burn-off rate. (See Pl.'s Affirmation, Ex. B, at 49-50; and Ex. O.)

4

intoxication," the effects of which include impairments in perceptual-motor coordination and cognitive processing. Acute intoxication, Dr. Pandina noted, will compromise a subject's ability to maintain routine vigilance, motor coordination, and balance. A person within this BAC range is ten times as likely to fall as one who is sober. (See id.)

Plaintiff retained two experts, Drs. William J. Closson and Richard Saferstein, to rebut Dr. Pandina's findings. In his affidavit, Dr. Closson challenges Dr. Pandina's use of the "Widmark" formula, and based upon his own findings, concludes that Mr. Shea's BAC was in the range of .02% and .08%. (See Affidavit of W. Closson, attached as Ex. H to Pl.'s Affirmation.)

II. Plaintiff's Motion to Preclude the Testimony of Robert Pandina

Plaintiff's motion attacks the Widmark formula as "junk science." (See, e.g., Memorandum in Support of Pl.'s Motion ("Pl.'s Mem.") at 4 (urging that the Court should not allow "invalid science"); Pl.'s Reply Affirmation ¶ 3 (questioning whether Dr. Pandina has employed "real science").) Even if the Widmark formula is accepted in principle, Plaintiff argues that Dr. Pandina has manipulated the numbers to increase Plaintiff's BAC. Specifically, Plaintiff argues that Dr. Pandina used a relatively low value of .58 for Plaintiff's reduced body mass, and that Dr. Pandina used a relatively slow burn-off rate of .015% per hour. (See Pl.'s

Affirmation ¶¶ 28-40.)   Finally, Plaintiff argues that even with
these skewed numbers, Dr. Pandina made mathematical miscalculations
in arriving at his conclusions. (See id. ¶¶ 41-52.)

Testimony by experts is governed by Federal Rule of Evidence
702, which states:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702.  District courts provide a "gatekeeping" role to
ensure that expert testimony is consistent with the dictates of
Rule 702. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579,
597 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)
(citing Daubert).  District courts are granted broad discretion in
deciding the admissibility of expert testimony. See United States
v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011) (citing Kumho, 526
U.S. at 152).

Dr. Pandina's education, training, and experience establish
him as an expert in forensic toxicology for the purposes of Rule
702.  Dr. Pandina has a Ph.D. in psychology and has served as the
Director of the Center for Alcohol Studies at Rutgers University
for nearly two decades.  In addition, he has taught numerous

courses and written several articles related to the field. (See Pandina Report; Declaration of J. Napoli in Opposition ("Def.'s Decl.") ¶ 33.)

Moreover, Dr. Pandina's testimony will be based on sufficient facts and data.   In his report, he cites numerous sources, including the incident report of Plaintiff's accident; the depositions of Plaintiff and family members that were present on the night of the incident; Plaintiff's responses to interrogatories; the reports and records of several doctors who interacted with Plaintiff; and ambulance and hospital records from the night of the incident. (See Pandina Report at 1.)   In determining Plaintiff's BAC, Dr. Pandina applied the Widmark formula, taking into account the amount and types of alcohol that were consumed; the beginning and end times of Mr. Shea's drinking; the varying rates of alcohol consumption that occurred during that time period; Mr. Shea's gender and weight; that Mr. Shea characterized himself as a "light to moderate social drinker"; and that Mr. Shea had eaten "various foods" during the course of the time period. (See id. at 2-3, 5.)

In addition, the Court is convinced that Dr. Pandina's testimony will be the product of reliable principles and methods. In Daubert, the Supreme Court provided a non-exclusive list of factors that district courts should consider in determining whether

7

or not an expert's reasoning or methodology is "scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 593-94. The Court stressed that the inquiry was to be "flexible," and that the list was not meant as a definitive checklist. See id. Among the factors considered by the Daubert Court were whether the scientific theory or technique can be objectively tested; whether the theory or technique has been subjected to peer review and publication; and whether the theory or technique is generally accepted in the scientific community. See id. at 593-94.

As shown in Plaintiff's own submissions to the Court, the Widmark formula is a "robust" formula that has been tested and applied for nearly 80 years. See A. Barbour, Simplified Estimation of Widmark "r" Values by the Method of Forrest, 41 Science & Justice 53 (2001)(attached as Ex. R to Pl.'s Affidavit); see also G. Simpson, Medicolegal Alcohol Determination: Widmark Revisited, 34/5 Clin. Chem. 888 (1988)(attached as Ex. S to Pl's Affidavit) (characterizing Widmark's work on medicolegal alcohol determination as "the seminal work in this field"). The Widmark formula has been the subject of peer review.[3] See id.

---

[3] The critique of Dr. Closson focuses on Dr. Pandina's application of the Widmark formula, but he does not attack the formula as generally inappropriate or unreliable. (See Affidavit of W. Closson, attached as Ex. H to Pl.'s Affirmation.)

8

Further, the Widmark formula and retrograde extrapolation enjoy general acceptance in the scientific community. See, e.g., L. Taylor and S. Oberman, Alcohol and the Human Body, in Drunk Driving Defenses, § 6.02 (7th ed. 2010) (remarking generally that "science has offered the 'Widmark Factor R'" and referring to the rate of alcohol elimination as simply, the "Widmark Factor B"); D. Ramsell, The Use of Defense Experts at Trial, in Understanding DUI Scientific Evidence, 2009 WL 1342280, at *3 (2d ed. 2009) (noting that retrograde extrapolation "relies on a scientific theory called 'Widmark's principle'"); and K. Keller, Sobering Up Daubert: Recent Issues Arising in Alcohol-Related Expert Testimony, 46 S. Tex. L. Rev. 111, 121 (2004) (pointing out that retrograde extrapolation is based on the generally accepted facts concerning absorption, distribution, and metabolism of alcohol in the human body, as derived from the work of Widmark).

The issue of retrograde extrapolation is primarily dealt with in state courts, where it is generally accepted. See State v. Burgess, 5 A.3d 911, 915 (Vt. 2010) (holding that trial court should not have excluded evidence, "because retrograde extrapolation is legitimate science"); People v. O'Connor, 290 A.D.2d 519, 520, 738 N.Y.S.2d 55, 56 (2d Dep't 2002) (affirming lower court's acceptance of retrograde extrapolation evidence); State v. Vliet, 19 P.3d 42, 50 (Haw. 2001) (holding that evidence

9

was properly admitted in light of "general acceptance of the Widmark formula in the scientific community and by the courts"); Mata v. State, 46 S.W.3d 902, 916-17 (Tex. Crim. App. 2001) (precluding under Texas Rule of Evidence 702 — modeled on Federal Rule of Evidence 702 — expert testimony where expert did not know the length of the "drinking spree," the time of the last drink, and the person's weight; but noting that in certain circumstances the Widmark formula could be deemed reliable). But see Evans v. State, 558 S.E.2d 51, 56 (Ga. Ct. App. 2001) (excluding Widmark-based expert testimony when expert stated that the formula had a 20 percent margin of error).

Many states, moreover, require that evidence of a retrograde extrapolation accompany evidence of a BAC test, to assist courts in determining a defendant's BAC level at the time of the violation, as opposed to the time that the BAC test was administered. See J. Sanders, "Utterly Ineffective": Do Courts Have a Role in Improving the Quality of Forensic Expert Testimony?, 38 Fordham Urb. L.J. 547, 566 (2010) (citing Connecticut v. Geisler, 498 U.S. 1019, 111 S. Ct. 663 (1991); State v. Robinett, 106 P.3d 436 (Idaho 2005); Commonwealth v. Colturi, 864 N.E.2d 498 (Mass. 2007); State v. Ladwig, 434 N.W.2d 594 (S.D. 1989); and State v. Dumont, 499 A.2d 787 (Vt. 1985)).

While the Court is not aware of any Second Circuit decisions

10

involving the Widmark formula or retrograde extrapolation, federal courts have found that retrograde extrapolation meets the standards of Rule 702. See Wallis v. Carco, 124 F.3d 218 (10th Cir. 1997) (upholding district court's admittance of expert testimony based on retrograde extrapolation); Weinstein v. Siemens, No. 07 Civ. 15000, 2010 WL 4825205, at *2-4 (E.D. Mich. Nov. 22, 2010) (quoting McCormick § 205 for the proposition that "arguments that the extrapolation process itself is so uncertain as to be inadmissible under Frye or Daubert have not prevailed"); and Becker v. Ault, No. C05-2028 (JAJ), 2006 WL 4017936, at *2 (N.D. Iowa Aug. 28, 2006) (finding that trial counsel was ineffective for failing to call an expert that "could have performed retrograde extrapolation, using Widmark's formula"). But see United States v. DuBois, 645 F.2d 642 (8th Cir. 1981) (disallowing testimony based on retrograde extrapolation when expert ignored the fact that defendant drank many beers after a drunk-driving accident).

Nevertheless, the Widmark formula in particular has been criticized for its inability to accurately reflect the effects that food consumption has on blood alcohol absorption levels. See Keller, at 124-25. Further, "under real-life drinking conditions, the maximum blood alcohol levels were, on average, found to be 10 to 30% lower than those obtained with Widmark's formula." H. Fradella, From the Legal Literature, 41 No. 3 Crim. Law Bulletin

11

Art. 7 (2005)(quoting C. Zernig & H. Battista, How to Calculate Maximum Blood Alcohol Levels after a Drinking Event, in Handbook of Alcoholism, 419-20 (G. Zernig, ed., 2000)).   In addition, as Plaintiff argues, the theory is generally used in conjunction with BAC tests. See Mata, 46 S.W.3d at 918.   Here, there are no tests to help Dr. Pandina pinpoint exactly what Mr. Shea's BAC level would have been at the exact time of the accident.

Having a definitive BAC test would help substantiate Dr. Pandina's conclusions, but the lack of such substantiation goes to the weight, and not the admissibility, of Dr. Pandina's testimony. Daubert created a liberal admissibility standard meant to exclude junk science — which this is not, see O'Neill v. JC Penney Life Insurance Co., No. 97 Civ. 7467 (CPS), 1998 WL 661513, at *5 (E.D.N.Y. Aug. 6, 1998) (quoting Iacobelli Constr., Inc. v. County of Monroe, 32 F.3d 19, 25 (2d. Cir. 1994)), and, as noted by the Daubert Court, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

Finally, the Court finds that Dr. Pandina has reliably applied the theory to the data.   In general, he simply plugged known data into a generally accepted formula.   The Court recognizes that Dr. Pandina used a relatively low value of .58 for Mr. Shea's reduced

body mass.  However, this is also the number that Dr. Pandina used
in his scholarly work, see D. Lester & R. Pandina, How to Use the
Alco-Calculator, (1983) (attached as Ex. L to Pl.'s Affirmation),
which leads the Court to conclude that he is being consistent in
his use of the Widmark formula, and that he was "being as careful
as he would be in his regular professional work outside his paid
litigation consulting." Sheehan v. Daily Racing Form, Inc., 104
F.3d 940, 942 (7th Cir. 1997).

The Court is not convinced by Plaintiff's argument that .015%
was an improperly low value for Dr. Pandina to assign as
Plaintiff's burn-off rate; Plaintiff's expert states himself that
.015% is within the normal range of burn-off rates. (See Pl.'s
Affirmation, Ex. H. ¶ 7.)  Plaintiff's argument regarding Dr.
Pandina's mathematical miscalculations is not trivial, but it goes
to the weight, and not admissibility, of this evidence. See Cache,
Inc. v. M.Z. Berger & Co., No. 99 Civ. 12320 (JGK), 2001 WL 38283,
at *11 (S.D.N.Y. Jan. 16, 2001).  Finally, while Dr. Pandina's
conclusions may not accurately reflect the effects of food on Mr.
Shea's  overall  BAC  level,  "[v]igorous  cross-examination,
presentation of contrary evidence, and careful instruction on the
burden of proof are the traditional and appropriate means of
attacking shaky but admissible evidence." Daubert, 509 U.S. at 596;
see also Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F.

13

Supp. 2d 558, 561 (S.D.N.Y. 2007) (noting that "the Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system").

Accordingly, Dr. Pandina's opinion testimony on Plaintiff's BAC is admissible in evidence. It follows that Plaintiff is not excused from paying the costs associated with Dr. Pandina's deposition. Nor does the Court find that Defendants should pay Plaintiff's costs associated with this motion or Dr. Pandina's deposition.

III. <u>Defendants' Cross-Motions to Preclude Plaintiff's Expert Witnesses</u>

Defendants seek to preclude Plaintiff from offering any affidavits or opinion testimony from Plaintiff's expert witnesses on the ground that Plaintiff has not complied with the requirements of Federal Rule of Civil Procedure 26(a)(2) or with this Court's Scheduling Order. Defendants argue that Plaintiff did not properly submit an expert report for either Dr. Closson or Dr. Saferstein, and that any attempts to do so at this point would be untimely. (<u>See</u> Defendant 9th Street Ventures' Memorandum ("Def.'s Mem.") at 2-3.)

Federal Rule of Civil Procedure 26(a)(2) requires that, in addition to the general disclosures required by Rule 26(a)(1), the

14

disclosure of expert witnesses must be accompanied by a report that
includes: (i) a complete statement and the underlying reasoning of
all opinions to be expressed by the witness; (ii) the facts or data
that were considered by the witness; (iii) any exhibits that will
be used; (iv) the witness's qualifications, including all
publications from the last 10 years; (v) a list of all cases in
which the witness was involved during the past 4 years; and (vi) a
statement of the compensation to be paid to the witness for his/her
study and testimony on the case. See Fed. R. Civ. P. 26(a)(2)(B).
Parties must make such disclosures and reports "at the times and in
the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).
The Court may sanction either side for failure to adhere to its
Scheduling Order. See Fed. R. Civ. P. 16(f).  If there has been no
order scheduling expert disclosure, the rules require that
disclosures of rebuttal experts must be made within 30 days of the
other party's disclosure. See Fed. R. Civ. P. 26(a)(2)(D)(ii).
Under Federal Rule of Civil Procedure 37(c)(1), a party may not use
information or a witness if that information or witness was not
properly disclosed under Rule 26(a), unless the failure was
substantially justified or was harmless. See Fed. R. Civ. P.
37(c)(1).

Here, the initial discovery deadline was April 7, 2010, and
the Court has been more than accommodating to the parties in

15

granting several requests for extensions of the deadline.[4] (See Memorandum Endorsed Order, dated Apr. 14, 2011 ("April 14 Order"); Memorandum Endorsed Order, dated June 14, 2010 ("June 14 Order"); Memorandum Endorsed Order, dated Sept. 30, 2010 ("September 30 Order"); Memorandum Endorsed Order, dated Dec. 22, 2010 ("December 22 Order").) The last scheduling order set an expert discovery deadline of February 28, 2011. (See December 22 Order.) On January 26, 2011, Plaintiff was served with Dr. Pandina's expert report. On February 25, 2011, Plaintiff disclosed that he would rebut Dr. Pandina's testimony with testimony by Dr. Closson and Dr. Saferstein, whose curriculum vitae were attached. (See Def.'s Cross-Motion, Exs. 6 and 7.) Neither expert, however, submitted a report. On February 28, 2011, the parties communicated by phone and email regarding, among other things, Plaintiff's failure to submit timely expert reports. (See Reply Declaration of J. Napoli ("Def.'s Reply Decl.") ¶ 18; see also Pl.'s Reply Affirmation, Ex. A.) Neither party, however, requested a Court-ordered modification of the deadline for expert disclosures. On April 14, 2011, Plaintiff submitted an affidavit from Dr. Closson in support of the in limine motion to preclude the testimony of Dr. Pandina. (See

---

[4] The parties were not without fault in the delays. In the April 14 Order, for example, the Court noted that the "parties have done little in an effort to comply with the schedule set in this case." (See April 14 Order.)

Pl.'s Affirmation, Ex. H.)  That is the full extent of Plaintiff's expert disclosures.

Even if the Court were to excuse Plaintiff's violation of the Scheduling Order, Plaintiff has failed to comply with the requirements of Rule 26(a).  Plaintiff has still not provided proper expert exchanges for either expert.  Plaintiff has yet to submit an expert report of any kind for Dr. Saferstein.  To the extent that Dr. Closson's affidavit was intended as an expert report, at best it arguably corresponds in substance to the requirements of Rule 26(a)(2)(B)(i)-(ii).  But the affidavit fails to conform to the additional enumerated requirements of Rule 26(a)(2)(B).  Dr. Closson's Curriculum Vitae contains references to "Select Publications and Presentations" and his appearance in "more than four hundred" trials and hearings, (see Def.'s Cross Motion, Ex. 6), but provides no specifics as to prior testimony and is not comprehensive with respect to his publications.

Under Federal Rule of Civil Procedure 37(c)(1), a court may preclude a party from using information or a witness if that information or witness was not properly disclosed under Rule 26(a), unless that failure was substantially justified or was harmless. See Fed. R. Civ. P. 37(c)(1).  A district court's decision to preclude an expert witness should be based on four balancing factors: (1) the party's explanation for its failure to follow the

17

scheduling order; (2) the importance of the precluded witness's tesimony; (3) the prejudice that would result to the other party as a result of having to prepare for the new testimony; and (4) the possibility of a continuance. See Softel, Inc. v. Dragon Med. and Scientific Commc'n, Inc., 118 F.3d 955, 961 (2d Cir. 1997) (citing Outley v. City of New York, 837 F.2d 587, 590-91 (2d Cir. 1988)).

As an initial matter, Plaintiff argues, unpersuasively, that Defendants' cross-motions to preclude the testimony of Drs. Closson and Saferstain were untimely, and that Defendants waived any objection to Plaintiff's untimely filing of its expert exchanges. (See Def.'s Reply Decl. ¶¶ 2, 5.)  The claim that Defendants' cross-motions to preclude testimony by Drs. Closson and Saferstein were untimely is frivolous, since Defendants were responding to the untimely submission of Dr. Closson's affidavit.  Until the affidavit was submitted, Defendants had nothing to which they could object.  Moreover, although the parties disagree as to whether Defendants consented to the untimely submission in a February telephone conversation,[5] it is irrelevant because the Court never authorized a departure from the Scheduling Order.  Under Rule 16(b)(4), scheduling orders may be modified "only for good cause

---

[5] The parties agree that there was a phone conversation regarding Plaintiff's late disclosures.  Defendant 9th Street Ventures, however, argues that it never conceded to an open-ended delay — it expected that the reports would be forthcoming within a matter of days. (See Def.'s Reply Decl., at 4-5.)

and with the judge's consent." <u>See</u> Fed. R. Civ. P. 16 (b)(4). Good cause has not been shown; nor was the Court's consent obtained or even sought.

With respect to the first <u>Outley</u> factor, Plaintiff's contention that Dr. Closson's April 14 affidavit was a timely response to Defendants' expert disclosures is meritless in light of the fact that Defendants' initial disclosure obligations were fulfilled by January 26, 2011, and under the Scheduling Order, the parties were obligated to complete expert discovery by February 28, 2011. The only potential shortcoming in Defendants' initial disclosures was that they did not include, as required by Rule 26(a)(2)(B), a statement of the compensation to be paid to the expert witness for his/her study and testimony on the case. It does not appear, however, that Plaintiff was aware of this shortcoming, as he did not highlight it to the Court as an excuse for his failure to respond to the disclosures in a timely manner. Defendants eventually did partially complete this requirement when they sent Plaintiff a bill following Dr. Pandina's February 22, 2011 deposition. (<u>See</u> Pandina Invoice, attached as Ex. W to Pl.'s Affirmation.) In any event, Plaintiff was not excused from his obligation to timely respond to the initial disclosure simply because of a shortcoming in Dr. Pandina's report, particularly where that shortcoming was never brought to the Court's attention

19

by Plaintiff. See Serin v. Northern Leasing Systems, Inc., No. 06.
Civ. 1625 (JSG), 2010 WL 6501660, at *1 (S.D.N.Y. Oct. 28, 2010)
(refusing to allow Plaintiff's improper disclosures to excuse
Defendant's untimely disclosures); see also Arnold v. Krause, 232
F.R.D. 58, 68 (W.D.N.Y. 2004) (party was precluded from using
expert witness testimony where there was no justification for
failing to comply with scheduling orders for expert disclosure).
In substance, there has been no justification offered for
Plaintiff's Rule 26 failures.

The second Outley factor weighs slightly in favor of
Plaintiff, as having rebuttal experts would help counter the impact
of Dr. Pandina's testimony. However, this factor does not weigh
strongly in favor of Plaintiff, because expert testimony is not the
only means by which Plaintiff can attempt to establish his
sobriety. He can undermine Dr. Pandina's testimony through
vigorous cross-examination and presentation of fact witnesses who
were with Plaintiff on the evening of the accident.

Under the third Outley factor, the Court finds that to allow
Dr. Closson and Dr. Saferstein to testify as experts would result
in real prejudice to Defendants. There would be significant
additional litigation costs in terms of time and money. To allow
the experts to testify at this point would deprive Defendants of an
opportunity to test and meet their assertions. If the experts were

required to submit Rule 26 reports, Defendants would have the right to depose them, and there might be a need for supplemental reports so that the opinions Defendants' experts express at trial conform to their pretrial submissions.

Similarly, the Court finds the fourth Outley factor weighs against Plaintiffs. This case is now ready for trial. Dispositive motions have been decided, yet the proposed experts have not submitted reports in compliance with Rule 26. The Court would be forced to reopen discovery while reports are prepared, and, as mentioned above, this process would lead to multiple exchanges between the parties. Given the numerous extensions of the discovery deadline, the further delay of this two-year-old litigation is neither deserved nor warranted, and the additional costs such delay would impose on Defendants amounts to real prejudice. See Gotlin, et al. v. Lederman, et al., No 04 Civ. 3736 (ILG), 2009 WL 2843380, at *6 (E.D.N.Y. Sept. 1, 2009) (declining to reopen expert discovery); Great White Bear, LLC v. Mervyns, LLC, No. 06 Civ. 13358 (RMB)(FM), 2008 WL 2220662, at *6 (S.D.N.Y. May 27, 2008)(noting that to grant an undeserved continuance would be unfair to both the opposing side and the court).

Thus, because the first, third, and fourth Outley factors weigh against Plaintiff, while the second factor weighs only slightly in his favor, the Court concludes that Plaintiff may not

present expert testimony at trial. Moreover, by ignoring the
Court-ordered deadlines and by failing to adhere to the clear
provisions of Rule 26(a)(2)(B), Plaintiff has not taken seriously
his obligations under the Federal Rules of Civil Procedure.
Therefore, the Court grants Defendants' cross-motion to exclude
testimony from Dr. Closson and Dr. Saferstein.

IV. Plaintiff's Motion to Exclude Portions of the Medical Records
as Unfairly Prejudicial and as Hearsay

Plaintiff argues that references to ETOH and intoxication in
the medical records should be struck from the record, as he
believes they are unfairly prejudicial and confusing. Plaintiff
further believes that a statement attributed to Plaintiff's friends
should be excluded as hearsay. (See Pl.'s Reply Affirmation ¶¶ 16-
24.)

A. References to "ETOH" and "intoxication" in the Medical Records

Plaintiff argues the references to ETOH and intoxication
should be struck from the record. He argues that while ETOH is
simply a medical shorthand for alcohol, the jury might see the term
in the medical records and believe that it means intoxication by
alcohol. (See id. ¶ 74). He argues that intoxication should be
struck from the medical records, because he believes that
intoxication is defined differently in the medical and legal
context. (See id. ¶¶ 75-77.)

22

Evidence is relevant, and thus admissible, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. However, "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The trial judge has broad discretion in determining the admissibility of evidence, see Meloff v. New York Life Ins. Co., 240 F.3d 138, 148 (2d Cir. 2001); Ismail v. Cohen, 899 F.2d 183, 188 (2d Cir. 1990); Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 747 (2d Cir. 1984), and in balancing relevance against unfair prejudice. See United States v. Bicaksiz, 194 F.3d 390, 396 (2d Cir. 1999) (noting that trial court judge's determinations under Rule 403 are reversed only when he or she acts "arbitrarily or irrationally").

The Court finds that Plaintiff's medical and hospital records, which include references to ETOH and intoxication, are clearly relevant and will not cause unfair prejudice to Plaintiff. These records will not definitively prove Mr. Shea's intoxication, but they do indicate the observations of hospital staff and go to the disputed issue of Mr. Shea's level of intoxication. This evidence

23

is highly relevant to the question of Mr. Shea's contributory negligence.  Moreover, and contrary to Plaintiff's contentions, "[i]t has long been settled law in the federal courts that notations made in hospital records regarding diagnosis and treatment, including notations regarding a patient's intoxication, are admissible in evidence." Stroud v. Roper Corp., No. 88 Civ. 1093 (KMW), 1990 WL 115610, at *1 (S.D.N.Y. Aug. 9, 1990) (citing Reed v. Order of United Commercial Travelers of America, 123 F.2d 252 (2d Cir. 1941); and Thomas v. Hogan, 308 F.2d 355 (4th Cir. 1962)).  As noted by the Thomas court, hospital records should be treated as highly trustworthy, even more trustworthy than general business records — "[h]uman life will often depend upon the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks." Thomas, 308 F.2d at 361.

Plaintiff's case may be harmed by references to ethanol and intoxication, but such harm is not the "unfair" prejudice that Federal Rule of Evidence 403 is intended to protect against.  "The prejudice that Rule 403 is concerned with involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." Perry v. Ethan Allen, Inc., 115 F.3d 143, 151 (2d Cir. 1997) (internal quotation marks omitted) (quoting United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir.

24

1995)); <u>see also</u>, <u>Ballou v. Henri Studios, Inc.</u>, 656 F.2d 1147, 1155 (5th Cir. 1981) (noting that virtually all evidence is prejudicial in some way, but that Rule 403 is concerned only with "unfair" prejudice).   The hospital records do not contain, for example, references to Mr. Shea's habitual drinking — the notations only refer to Mr. Shea's condition on the day of the incident. <u>Cf.</u> <u>Stroud v. Roper Corp.</u>, 1990 WL 115610, at *3.

Nor is the Court concerned that the risk of jury confusion substantially outweighs the probative value of the evidence. <u>See</u> Fed. R. Evid. 403.   Plaintiff argues that ETOH is simply a medical shorthand for alcohol, and that a jury might confuse the issue and interpret it to mean "intoxicated." (<u>See</u> Pl.'s Affirmation ¶ 74.) Plaintiff also argues that there is a discrepancy between the way intoxication is defined medically and legally. (<u>See</u> Pl.'s Affirmation ¶¶ 76-77.)

The Court, however, is not concerned that there will be confusion with either term.   On page 00009 of the medical records, the Medical Chart lists "ETOH INTOX" as a stated complaint of the patient, Mr. Shea. (<u>See</u> Medical Records of J. Shea, attached as Ex. 1 to Def.'s Decl., at 00009.)   "ETOH" is qualified by the word, "INTOX," which further describes the particular meaning of "ETOH" in this context — the patient was not merely influenced by ETOH, he was intoxicated with ETOH.   Similarly, Plaintiff's nutrition

25

assessment lists "ETOH abuse." (<u>See</u> <u>id.</u> at 00080.)  If anything, these specific examples, where "ETOH" is qualified, may be used to support Plaintiff's argument that the term "ETOH," when standing alone, is simply a shorthand term meaning "alcohol."  Plaintiff is free, furthermore, to introduce evidence that explains what "ETOH" means when used in shorthand form on a medical record.

The Court is similarly unconvinced that the inclusion of the term "intoxication," or any of its variant forms, will confuse the jury.  While there are many meanings for "intoxication," it is often used in the medical context to refer to a state induced by the use of alcohol.  Stedman's Medical Dictionary, for example, lists "poisoning" and "acute alcoholism" as synonyms for intoxication. <u>Stedman's Medical Dictionary</u> 916 (27th ed. 2000). Dorland's Illustrated Medical Dictionary defines intoxication as both (1) "stimulation, excitement, or stupefaction produced by a chemical substance, or as if by one," and (2) "substance intoxication, particularly that in which the substance is alcohol," and (3) "poisoning." <u>Dorland's Illustrated Medical Dictionary</u> ("Dorland's") 966 (31st ed. 2007).  Both dictionaries define various types of intoxication, such as water intoxication and roentgen intoxication.  As with most words, context is essential for determining the precise meaning of a particular reference.

As used in the hospital records, the term clearly refers to

intoxication by alcohol.   Referring again to the example on page 00009, "ETOH intox[ication]" is a "stated complaint" of the Patient. (See id.)  Further, on page 00014, the records state that the Patient "is intoxicated and not able to answer questions at this time." (See id. at 00014.)  Neither example is, as Plaintiff argues, a reference to a "desired state . . . produced by a substance," distinguishable from a state of intoxication by alcohol. (See Pl.'s Affirmation ¶ 76.)  Rather, both entries refer to a condition reached by the Plaintiff as a result of his intake of alcohol — in one instance it is given as his "stated complaint," and in the other, as a reason for his failure to respond to questioning.   Plaintiff is, of course, free to introduce definition-based evidence that would limit the weight to be given these terms.

B. Plaintiff's Hearsay Objections to the Medical Records

Plaintiff argues that statements made by Plaintiff's friends to hospital personnel, as reflected in the medical records, should be excluded at trial as impermissible hearsay.  Specifically, the medical records contain the statement that "[a]s per patient's friends, he has had a lot to drink tonight." (See Medical Records of James Shea, attached as Ex. 1 to Def.'s Decl., at 00025.)

Federal Rule of Evidence 803(6) provides an exception to the

27

hearsay rule for business records. See Fed. R. Evid. 803(6).
"Medical records . . . can be admissible under Federal Rule of
Evidence 803(6), provided they are prepared in the regular course
of business, near the time of occurrence, by a person with
knowledge and are properly authenticated." Hodges v. Keane, 886 F.
Supp. 352, 356 (S.D.N.Y. 1995) (citing Romano v. Howarth, 998 F.2d
101, 108 (2d Cir. 1993)); see also United States v. Sackett, 598
F.2d 739 (2d Cir. 1979)(holding that hospital records as admissible
if they "were kept in the course of the regularly conducted
business activity of the hospital").

     To the extent that the medical records contain statements, the
statements may be admissible under Federal Rule of Evidence 803(4)
if they are:

          Statements made for purposes of medical diagnosis or treatment
          and describing medical history, or past or present symptoms,
          pain, or sensations, or the inception or general character of
          the cause or external source thereof insofar as reasonably
          pertinent to diagnosis or treatment.

Fed. R. Evid. 803(4). There is no requirement that the statements
be made by the patient, or that the statements be made to a
physician. See Mendez v. United States, 732 F. Supp. 414, 423
(S.D.N.Y. 1990); see also Davignon v. Clemmey, 322 F.3d 1, 8 (1st
Cir. 2003); United States v. Yazzie, 59 F.3d 807, 813 (9th Cir.
1995); McCormick on Evidence, § 277 (Kenneth S. Broun, 6th ed.

2009). The patient's relationship to the declarant is often determinative, see Mendez, 732 F. Supp. at 423 (citing Weinstein § 803.04[01]), though considerations of motive are also taken into account. See McCormick § 277 n.14 (citing Weinstein § 803.06[06]). For example, in cases involving child abuse, a court may reasonably question a parent's motives to tell the truth. See United States v. Balfany, 965 F.2d 575 (8th Cir. 1992).

Here, the statement, that Mr. Shea "has had a lot to drink tonight," was made by Mr. Shea's friends. It is not clear from the record who made this statement, but Mr. Shea was accompanied to the hospital by Alison O'Brien and her roommate, Lauren Bernden. (See Deposition of A. O'Brien, attached as Ex. D to Pl.'s Affirmation, at 43). These are the two people Plaintiff was socializing with at Solas when the accident occurred. Ms. O'Brien is Mr. Shea's sister-in-law. (See id. at 15-16.) They have known each other for roughly five years, and they appear to have a friendly relationship. (See id. at 14 (describing Mr. Shea as "funny" and "nice").) Ms. Bernden was Ms. O'Brien's roommate. (See id. at 43.)

The Court concludes, and Plaintiff does not assert otherwise, that neither Ms. O'Brien or Ms. Bernden had ulterior motives when this statement was made, and that the statement was made to hospital employees for the purpose of aiding in Mr. Shea's medical treatment. The Court has little reason to doubt the veracity of

29

the statement, and, therefore, it is admissible under Rule 803(6).

IV. <u>Conclusion</u>

For the reasons stated, Plaintiff's motion is denied in its entirety, and Defendants' cross-motions are granted.

SO ORDERED.

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:    June 16, 2011
          New York, New York

30